**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**FRANK McCLELLAN,**

                              **Plaintiff,**

              **v.**                                    **1:02-CV-1141**
                                                        **(GLS/DRH)**

**STEVEN SMITH,**

                              **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Lee D. Greenstein            LEE D. GREENSTEIN, ESQ.
600 Broadway
Albany, New York 12207

**FOR THE DEFENDANT:**
Mills Law Firm                         CHRISTOPHER K. MILLS, ESQ.
1520 Crescent Road                     GREGORY S. MILLS, ESQ.
Suite 100                              BRIAN P. KRZYKOWSKI, ESQ.
Clifton Park, New York 12065

**Gary L. Sharpe**
**U.S. District Judge**

<u>**MEMORANDUM-DECISION AND ORDER**</u>

### I. <u>Introduction</u>

       Following an altercation with City of Rensselaer Detective Steven

Smith, Frank McClellan was arrested and prosecuted for, *inter alia*,

felonious assault.  After he was acquitted, McClellan filed this civil rights

suit asserting claims for unlawful imprisonment and malicious prosecution.[1]
*See* 42 U.S.C. § 1983.  The district court initially granted Smith summary
judgment.  On appeal, however, the Circuit vacated and remanded for trial.
*See McClellan v. Smith*, No. 1:02-cv-1141, 2004 WL 5551248 (N.D.N.Y.
Sept. 8, 2004), *reconsideration denied* (Oct. 25, 2004), *vacated and
remanded*, 439 F.3d 137 (2d Cir. 2006).  The trial jury then returned a
verdict for McClellan, awarding $170,000 in exemplary and punitive
damages.  However, the verdict was not final because Smith's qualified
immunity defense was reserved for decision by this court as a matter of
law.  McClellan subsequently moved for attorney's fees and costs, and
Smith alternatively moved for either judgment notwithstanding the verdict or
a new trial.[2]  (*See* Dkt. Nos. 106, 118; *see also* FED. R. CIV. P. 50, 59.)

---

[1]The court and parties frequently referred to McClellan's first cause of action
interchangeably as "false arrest" or "false imprisonment."  The correct nomenclature is "false
imprisonment" because McClellan was arrested without a warrant and, therefore, without
process.  *See Wallace v. Katko*, 549 U.S. 384, 388-89 (2007).  As to *Wallace*, the court also
apologizes for the confusion it likely caused the parties during the underlying proceedings.
When discussing arrest and probable cause, the court incessantly referenced *Wallace* when it
intended to refer to *Devenpeck.  See Devenpeck v. Alford*, 543 U.S. 146 (2004).  The likely
explanation is nothing more profound than unlike Ray Charles and Willie Nelson who had
Georgia on their minds, the court had *Wallace* on its mind.

[2]After the verdict, final judgment was erroneously entered because the qualified
immunity decision was pending.  After Smith filed his alternative motions, McClellan moved to
strike them as untimely.  (*See* Dkt. No. 120; *see also* FED. R. CIV. P. 50(b).)  The court
subsequently noted its error, and vacated judgment.  (*See* Dkt. No. 105 and 7/17/07 Text
Order; *see also* FED. R. CIV. P. 60(a).)  McClellan's motion to strike was then denied because
Smith's motions were timely.  (*See* 7/17/07 Text Order.)

For the reasons that follow, the court denies Smith qualified immunity, denies Smith's motions in their entirety, and awards McClellan attorneys' fees and costs.

## II.  Rule 50 and 59 Standards of Review

Under Rule 50, "[j]udgment as a matter of law is proper when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *United States v. Space Hunters, Inc.*, 429 F.3d 416, 428 (2d Cir. 2005) (citing FED. R. CIV. P. 50(a)(1)).  Rule 59(a)(1), however, permits a new trial when "in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotation marks and citation omitted).

Rule 50 requires the court to "consider the evidence in the light most favorable to the party against whom the motion was made and ... give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence."  *Space Hunters, Inc.*, 429 F.3d at 429 (internal quotation marks and citation omitted); *see also Reeves v. Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. 133, 150 (2000).  "The court

3

cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."  *Space Hunters, Inc.*, 429 F.3d at 429 (internal quotation marks and citation omitted).  Thus, a Rule 50 motion may granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).  Under Rule 59, the court is free to weigh the evidence and grant a new trial if the jury's verdict is against the weight of that evidence.  *See DLC Mgmt. Corp.*, 163 F.3d at 133.

Given Smith's arguments, the trial evidence, and the court's analysis, the differences in the Rule 50 and Rule 59 standards are of no moment. Even when weighing the evidence under Rule 59, the evidence and the reasonable inferences and conclusions to be drawn therefrom support the jury's verdict for McClellan.  Accordingly, under either standard, the facts are as the court recites them.

### III. **Facts**

**A.    The Altercation**

On November 16, 2000, McClellan and his girlfriend, Michelle Cristo,

4

went grocery shopping.  McClellan was driving his 1991 Subaru Justi, a sub-compact, two-door sedan.  They returned home at 7:30 p.m., and McClellan legally parked curbside in front of his house and in front of his truck.  While parking, he bumped his truck, and groceries in the backseat of his Subaru fell on the floor.  After parking, he handed Cristo two grocery bags, and she took them inside the house.  McClellan then exited his car and while standing partially in the traffic lane, he folded down the front seat in order to re-bag the groceries.  He then handed the bags to Cristo, who had returned and was standing in front of the Subaru.

While McClellan was unloading, he heard a car horn blaring from behind.  He continued to unload, reaching into the backseat for other items.  He then noticed a maroon car slowly driving past him.  Smith, the maroon car driver, saluted McClellan with his middle finger—the universal symbol of insult and derision.  As Smith proceeded slowly up the street, McClellan saw him look in his rearview mirror, salute a second time, and wildly gesture with his hands.  Standing beside his car, McClellan returned the salute.

Unbeknownst to McClellan, Smith held the positions of third-in-command of the Rensselaer Police Department, Chief of Detectives, and

part-time investigator for the Rensselaer County District Attorney's Office. Having gone home for dinner, Smith was returning to the police station.  He was wearing plain clothes, he had no exposed badge or gun, and he was driving an unmarked car.  Nothing about his appearance or that of the vehicle identified him as a police officer.

The average citizen would not expect a police officer—much less the third-in-command of a police department and Chief of Detectives—to blow his horn at a citizen trying to unload groceries from a properly parked car, give him an offensive salute, or wildly gesture after passing.

After the initial exchange of pleasantries, McClellan finished unloading his car, put the seat back to its original position, and locked the car door.  He then noticed the maroon car returning toward him on the opposite side of the street.  At that point, the stories of the two protagonists diverged sharply.

It is arguable that by opening his car door into traffic, McClellan committed a traffic infraction.[3]  According to Smith, he returned to tell McClellan to close his door and be careful because he was obstructing

_____

[3]See N.Y. VEH. & TRAF. LAW § 1214 (McKinney 1996) (unsafely opening car door in traffic).

traffic.  Smith testified that he was not conducting a traffic stop, and he had

no intention of issuing a traffic citation or arresting McClellan.  In fact, as

Chief of Detectives he did not even have a ticket book.  According to Smith,

he pulled up parallel to McClellan, rolled down his window, and identified

himself as a police officer.  Although this initial intrusion was simply a public

conversation between police officer and citizen, at most it was a traffic stop.

According to Smith, when he rolled down his window, McClellan

immediately assaulted him by swinging at him through the open window.

According to McClellan, as Smith returned, he abruptly cut across

traffic, stopped at an angle within inches of the Subaru, and pinned

McClellan into the wedge caused by the angled vehicles.  Smith's side view

mirror hit McClellan.  Smith rolled down his driver's side window, and said,

"Do you know who the f*** (expletive) you just gave the finger to?  I'm a

cop."  McClellan replied, "You just hit me with your car.  I would like to see

some ID."  Smith responded, "I don't have to show you any f******

(expletive) ID."  In McClellan's opinion, Smith's irrational behavior was

inconsistent with that of a police officer and Smith appeared to have been

drinking.

Smith attempted to open his car door, but McClellan held it shut,

7

explaining that he would let Smith out if he showed identification.

McClellan had recent surgery and did not want a physical confrontation

with an irate person.  Smith became angrier, and screamed at McClellan.

In an effort to get out, Smith repeatedly rammed his shoulder into the door

and struck McClellan.  McClellan continued to push back, and as the two

jockeyed with the door, the corner of the door struck Smith in the face

causing a severe laceration.

Smith eventually forced the door open into the side of McClellan's

body.  McClellan was forced backward so that his backside was against the

fender of his Subaru.  When Smith emerged, McClellan noticed that he was

holding something in his hand which turned out to be a handheld radio that

Smith used to call for assistance.  Smith struck McClellan in the face with

his fists, and McClellan responded by grabbing Smith's wrists and holding

him down on top of the Subaru.  McClellan then urged Smith not to attack

him again.  Smith agreed, and McClellan loosened his hold.  However, as

McClellan then walked toward the house, Smith grabbed him from behind

and told him that he was under arrest.  At that point, Cristo was standing on

her front porch yelling for help, and Smith threatened to arrest her.  The

court cannot fathom what cause, probable or otherwise,  formed the basis

for Smith's threat to arrest Cristo.

Smith alleged that McClellan used the car door to assault him as he tried to exit, and continued to punch and assault him after he exited the vehicle.  Smith also said that during the altercation, McClellan committed the violation of disorderly conduct by screaming obscenities and pounding on Smith's car.[4]

In resolving issues of credibility, the jury found that (1) McClellan never attempted to punch Smith while Smith was seated in the car, (2) McClellan never intentionally caused the car door to strike Smith, and (3) McClellan never attempted to punch Smith once Smith had exited his vehicle.  Accordingly, the court adopts the conclusions reached in the jury's verdict and answers to special interrogatories.

## B.   Arrest and Arraignment

After Smith restrained McClellan, numerous police officers arrived. Smith told Officer Butler that McClellan had attacked him, and instructed Butler to take McClellan into custody.  Butler then handcuffed McClellan and drove him to the police station.

---

[4] *See* N.Y. PENAL LAW § 240.20(7) (McKinney 2008) (disorderly conduct); N.Y. Penal Law § 10.00(1-6) (McKinney 2009) (violation is a non-criminal offense); *see also* Disorderly Conduct Information, Dkt. No. 15:5 (original exhibit returned to plaintiff post-trial).

As the sole complaining witness, as Chief of Detectives and third-in-command of the Department, and with the explicit consent of Police Chief Fusco—who ignored an obvious conflict of interest—Smith caused and orchestrated all police activity that followed McClellan's arrest.  Moreover, the facts support the conclusion that given his position as an investigator and his incestuous relationship with the Rensselaer County District Attorney's Office prosecutors who conducted McClellan's prosecution, Smith caused and orchestrated subsequent prosecutorial decisions.  Thus, at Smith's direction, McClellan was charged as follows: by Felony Complaint, the felonies of aggravated assault on a police officer and assault in the second degree pursuant to N.Y. PENAL LAW §§ 120.11 and 120.05(3); by Information, the misdemeanor of resisting arrest and the violation of disorderly conduct pursuant to N.Y. PENAL LAW §§ 205.30 and 240.20(7);[5] and by Simplified Traffic Information, the traffic infraction of unsafely opening door into traffic pursuant to N.Y. VEH. & TRAF. LAW § 1214.  Except for the traffic infraction, all charges arose after Smith's arrest for assault.

_____

[5]At trial, Smith also testified that before the altercation, McClellan's conduct violated §240.20(5) because McClellan obstructed vehicular traffic.  Again, however, he testified that he had no intention of arresting him on that basis, and that the actual disorderly conduct charge reflected post-arrest conduct.

After his arrest, McClellan was transported to the police station where he was booked, fingerprinted, interrogated, and held in the police lockup until the following day.  The maximum sentence for aggravated assault on a police officer is twenty-five years in state prison.  *See* N.Y. PENAL LAW § 70.00(2)(b).  If charged with the traffic violation only, he would have received a traffic citation and released roadside with the option to dispose of the matter by mail or personal appearance.  If charged with disorderly conduct and not the felonies or misdemeanor, he would either have been arraigned and released that evening, or released that evening on pre-arraignment or desk bail.[6]  He would not have been confined in the lockup for the night.

The following morning, McClellan was arraigned on the criminal charges by City Court Judge Robichaud, and remanded to the Rensselaer County Jail without bail where he spent the next six days.  On November 21, 2000, a preliminary hearing was held, and Smith was the only witness for the prosecution.  Based on Smith's testimony, the judge found probable cause to believe that McClellan had assaulted Smith, bound the case over

_____

[6]The court recognizes New York statutory arguments to the contrary, but credits the Rynkowski testimony regarding process in the real world.

for grand jury action, and set bail at $50,000.  McClellan posted a bond, and was released on November 22.

## C.   **Grand Jury Proceedings and Prosecution**

After the November 16, 2000 events, Smith supervised the continuing McClellan investigation, assigning his detectives to various tasks, including witness interviews and photography, and assigning new officers to the case when dissatisfied with current detectives' efforts.  He also remained in his part-time position at the District Attorney's Office.

After the preliminary hearing, but before the case was presented to a Rensselaer County grand jury, the Rensselaer County District Attorney's Office was removed by a recusal order issued by Rensselaer County Court Judge McGrath based on the conflict caused by Smith's employment with that office.  The Washington County District Attorney's Office was substituted as special prosecutor.  On February 1, 2001, Washington County made the grand jury presentment, and McClellan, Smith, and others testified.  The grand jury returned a "no bill," dismissing all charges against McClellan.

Unhappy with the no bill, Smith learned from the prosecutors and other police witnesses involved in the grand jury presentation that the

12

grand jurors questioned his testimony regarding the position of the vehicles during the altercation.  Smith subsequently approached Officer Butler about his contradictory testimony, and sought to persuade Butler to change his account.

On March 12, 2001, the Washington County special prosecutor moved to re-submit the case to a new grand jury, but Judge McGrath denied the motion in the absence of new evidence.  Meanwhile, Smith was lobbying for a second presentment, and learned from a Rensselaer Assistant District Attorney that new evidence was necessary.  Thus, on the same day, March 12, the Rensselaer District Attorney's Office called the jail seeking a list of inmates that had been incarcerated with McClellan.

Ten days later, the Washington County special prosecutor withdrew his motion to re-submit.  During that same period, Smith resigned his investigator's position, and the Rensselaer District Attorney obtained an order from Judge McGrath dissolving the recusal order because the conflict had dissipated.  Then, Smith, having ordered his detectives to interview jail inmates, found a witness who stated that while incarcerated, McClellan admitted that he knew Smith was a police officer when the altercation began.  Based on this new evidence, the Rensselaer District Attorney

sought another order from Judge McGrath permitting re-submission.  On

May 2, 2001, Judge McGrath issued a re-submission order.

Thereafter, the case was re-presented by two Assistant Rensselaer

District Attorneys.  The inmate testified to the McClellan admission, and

Smith altered his testimony about the angle of the cars at the time of the

incident.  This time, the grand jury indicted McClellan for the original two

felony assaults charged in the felony complaint, and a third felony count of

assault on a police officer under N.Y. PENAL LAW § 120.08.  More than one

year later, McClellan was tried on all three counts, and the jury acquitted

him.  McClellan then filed this suit in federal court.

**D.    Civil Trial**

From before trial to moments before the jury charge, the court

maintained a running dialogue with the parties in an attempt to focus them

on the precise legal and factual issues to be submitted to the jury.

Ultimately, McClellan focused on the felony assault charges, and agreed to

discontinue his claims regarding the traffic infraction, the disorderly conduct

violation, and the misdemeanor resisting arrest charge.  Those charges

could not support his claims because there was no evidence that they were

terminated in his favor.[7]  Smith continued to insist that if probable cause

supported the traffic citation and disorderly conduct violation, the existence

of that limited probable cause provided a complete defense to both the

false imprisonment and malicious prosecution claims.  The court disagreed,

and declined his requested jury charge to that effect.        The jury

rendered a verdict on McClellan's behalf, and awarded $150,000 in

compensatory damages and $20,000 in punitive damages.

## IV.  Discussion

Smith moves to dismiss all causes of action in their entirety.  (*See*

Smith Mem. of Law at 1, Dkt. No. 118:3.)  In reliance on his subjective view

of the evidence or, alternatively, his view of evidentiary weight, Smith urges

the court to adopt and substitute its judgment for that of the jury.  His

arguments are as follows: (1) Smith had probable cause to arrest

McClellan for felonious assault; (2) Smith had probable cause to arrest for

other offenses, and the jury should have been instructed accordingly; (3)

Smith is entitled to qualified immunity on the false arrest claim because

arguable probable cause existed; (4) Smith is entitled to qualified immunity

---

[7]In response to the court's direct question regarding the disposition of those charges in state court, only plaintiff's counsel responded.  He indicated that he did not know and that he believed they had simply disappeared into a "black hole."

15

on the malicious prosecution claim because McClellan failed to rebut the

presumption of probable cause that arose from the state indictment and

because Smith's actions were reasonable; (5) punitive damages are

impermissible as a matter of law given the trial evidence; and (6) Smith is

entitled to a new trial because McClellan failed to disclose key evidence

before trial.

## A.   False Imprisonment and Malicious Prosecution:  Probable Cause and Qualified Immunity

## 1.   Malicious Prosecution

McClellan's false imprisonment and malicious prosecution claims are

distinct common law torts.[8]  *See Weyant v. Okst*, 101 F.3d 845, 853 (2d

Cir. 1996); *see also Wallace*, 549 U.S. at 389.  His false imprisonment

began when he was unlawfully detained and it ended when he was held

pursuant to legal process upon arraignment in City Court hours later on the

morning of November 17.  *See Wallace*, 549 U.S. at 389.  Once he was

arraigned, the malicious prosecution began because legal process was

wrongfully instituted.  *See id.*  And the continued detention and subsequent

---

[8]While the distinction between false imprisonment and malicious prosecution is important, there is no pragmatic difference between false imprisonment and false arrest.  False arrest is simply a species of false imprisonment, and the elements of both are the same.  *See Jenkins v. City of New York*, 478 F.3d 76, 88 & n.10 (2d Cir. 2007); *Singer v. Fulton County*, 63 F.3d 110, 118 (2d Cir. 1995)).

prosecution form the basis for McClellan's damages.  *See id.*

Although the claims are distinct, probable cause is an element of both false imprisonment and malicious prosecution.  As to false imprisonment, McClellan was required to prove: (1) Smith intended to confine him; (2) McClellan was aware of the confinement; (3) McClellan did not consent to the confinement; and (4) the confinement was not otherwise privileged (e.g., no probable cause existed).  *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).  As to malicious prosecution, McClellan was required to prove: (1) Smith initiated or continued a criminal proceeding; (2) without probable cause; (3) the proceedings terminated in McClellan's favor; and (4) Smith was motivated by malice.  *See Murphy v. Lyon*, 118 F.3d 938, 947 (2d Cir. 1997); *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

As noted, the existence of probable cause is a complete defense to both claims.  *See McClellan*, 439 F.3d at 145; *see also Singer*, 63 F.3d at 118-19.  However, each claim focuses on a different probable cause inquiry.  False imprisonment asks whether the facts known to the police officer at the time of confinement objectively establish probable cause. *See Jaegly v. Couch*, 439 F.3d 149, 153-54 & n.1 (2d Cir. 2006) (citing

17

*Davenpeck v. Alford*, 543 U.S. 146, 152-53 (2004)).  Malicious prosecution

asks whether the facts objectively support a reasonable belief that a

criminal prosecution should be initiated or continued because that

prosecution could succeed.  *See, e.g.*, *D'Angelo v. Kirschner*, 288 Fed.

Appx. 724, 726-27 (2d Cir. 2008); *Posr v. Court Officer Shield #207*, 180

F.3d 409, 417 (2d Cir. 1999).  It is erroneous to conflate probable cause to

arrest with probable cause to prosecute, especially where the crimes on

which arrest was premised differ from the crimes prosecuted.  *See*

*D'Angelo*, 288 Fed. Appx. at 726.  And even if the crimes underlying the

arrest and the crimes prosecuted are identical, intervening evidence could

eliminate probable cause.  *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d

Cir. 2003) (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir.

1996)).  For instance, groundless charges might become apparent.  *See*

*Lowth*, 82 F.3d at 571.  Thus, the *Devenpeck* probable cause principles

adopted by the Second Circuit in *Jaegly*, have no bearing on a malicious

prosecution claim.  *See D'Angelo*, 288 Fed. Appx. at 726.

Somewhat difficult to decipher, Smith's current arguments appear to

make no distinction between the false imprisonment and malicious

prosecution claims.  Regardless, he clearly insisted at trial that probable

18

cause to arrest was synonymous with probable cause to prosecute. According to Smith, probable cause to arrest operated as a complete defense to both of McClellan's claims.  That argument is simply wrong.  As already discussed, *Devenpeck* and *Jaegly* are irrelevant to malicious prosecution.  Furthermore, McClellan had already withdrawn any non-assault offense as the basis for his malicious prosecution claim.  Accordingly, the jury was properly instructed to consider whether probable cause supported Smith's decision to initiate and continue felony assault proceedings.  The jury's verdict and answers to the special interrogatories reflect that Smith did not have probable cause to initiate or continue McClellan's assault prosecution.  Therefore, the court adopts these conclusions as supported by the evidence.

Smith's remaining malicious prosecution arguments are summarily rejected.  He continues to argue that the grand jury indictment was a complete defense because it presumptively established probable cause. As the Second Circuit has already observed, there were numerous instances of Smith's post-arraignment behavior which, if true, rendered the presumption of probable cause meaningless.  *See McClellan*, 439 F.3d at 146.  While the Second Circuit's summary judgment ruling was based on

McClellan's version of events, the trial evidence fully supported those pre-trial conclusions.  The same evidence contradicts Smith's claim that he had no control over McClellan's prosecution once it was turned over to the Washington County and Rensselaer County District Attorneys.  Clearly, Smith heavily influenced the continuing prosecution.

Lastly, Smith is not entitled to qualified immunity.  Malicious prosecution implicates the Fourth Amendment right to be free from unreasonable seizure, and McClellan was required to establish some deprivation of his liberty consistent with this notion.  *See Rohman v. N.Y. City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).  While McClellan's post-arraignment incarceration alone was sufficient to do so, additional events including the preliminary hearing, grand jury presentment, and trial further established a deprivation of his Fourth Amendment rights.  *See id.* at 216.  Since McClellan established a constitutional right, the next question is whether Smith's actions were objectively reasonable.  Since McClellan did not assault Smith, no reasonable police officer would have believed it objectively reasonable to initiate and pursue McClellan's prosecution.  *See id.* at 216-218.  Thus, the court denies qualified immunity for Smith.

20

**2.    False Imprisonment**

Smith similarly argues that the false imprisonment verdict cannot stand because: (1) he had probable cause to arrest for felonious assault; (2) he had probable cause to arrest for other offenses; and (3) he is entitled to qualified immunity because reasonable police officers would objectively believe that he had arguable probable cause.  The court rejects Smith's first argument as well as his qualified immunity defense based on that argument.  When coupled with the jury's verdict and answers to the special interrogatories, there is no view of the evidence that supports the conclusion that there was an objective basis, or arguably objective basis, to arrest McClellan for assault.

Because Smith's remaining argument is that he had probable cause to arrest McClellan for other offenses, the court now squarely confronts the parameters of *Devenpeck* and *Jaegly*.  Smith argues that the court erroneously applied a "closely-related" offense test in contravention of *Devenpeck* when it refused to charge that probable cause to arrest for the traffic infraction or violation constituted a defense to McClellan's false imprisonment claim.  Smith misunderstands the court's decision.  Instead, the court believes that the facts of this case and those of *Devenpeck* and

*Jaegly* are distinguishable and, therefore, the closely-related rationale is inapplicable.  In essence, the court believes that there was a distinct legal break in the sequence of underlying events, and that Smith's subsequent improper conduct caused McClellan's arrest.  This conclusion is supported by both the Fourth Amendment and practical considerations.

There are two inquiries when considering the reasonableness of police intrusions on Fourth Amendment liberty interests.  First, what liberty interest was intruded upon, if any?  Secondly, was the intrusion objectively reasonable under the circumstances?  The court has previously discussed the differing levels of police-citizen encounters, the corresponding liberty interests at stake, and the extent to which police intrusions are authorized in light of those interests.  See *United States v. Miller*, 382 F. Supp.2d 350, 365-67 (N.D.N.Y. 2005).  The least intrusive level is a voluntary public encounter between officer and citizen which involves no Fourth Amendment intrusion absent some accompanying restraint by show of authority or force.  *See id.* at 365 (citations omitted).  In other words, the Fourth Amendment does not preclude police officers from approaching citizens in public and engaging them in conversation.

Vehicle and traffic stops and *Terry* stops constitute the intermediate

levels of intrusion, and factors governing their respective reasonableness overlap. *See id.* at 366-67; *see also Terry v. Ohio*, 392 U.S. 1 (1968). Other than voluntary public contacts, most police-citizen encounters involve some form of citizen restraint, which thereby invoke the Fourth Amendment's reasonableness requirement. *See Miller*, 382 F. Supp.2d at 366-67 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Nonetheless, the first question is still whether there is a Fourth Amendment intrusion, which requires analysis of the dual perspectives of the police officer and the citizen. From the citizen's perspective, the "court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to ... terminate the encounter." *Bostick*, 501 U.S. at 439; *see also United States v. Drayton*, 536 U.S. 194, 202 (2002). If a citizen would have felt free to do so, there is no restraint and no Fourth Amendment reasonableness requirement. *See Florida v. Royer*, 460 U.S. 491, 498 (1983). On the other hand, if there is a restraint coupled with a reasonable suspicion of criminal activity from the officer's perspective, the intrusion is authorized and the officer may conduct a *Terry* stop. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing, *inter alia*, *Terry*, 392 U.S. at 9).

Similarly, a vehicle and traffic stop is deemed a Fourth Amendment intrusion and it is reasonable if the police objectively believe there has been a violation of the traffic laws.  *See Miller*, 382 F. Supp.2d at 366 (citations omitted).  Once a *Terry* stop or vehicle stop occurs, the restraint of liberty—the detention—must be brief, either intended to dispel the criminal suspicions or process the traffic violation.  *See id.* at 367; *see also Royer*, 460 U.S. at 500.

Naturally, arrest constitutes the greatest level of intrusion.  As a threshold matter, the point of arrest must be ascertained.  The reasonableness of the arrest will depend on whether the objective facts then known to the officer permit a reasonable conclusion that the citizen committed an offense, related or unrelated to the offense for which he was arrested.  *See Miller*, 382 F. Supp.2d at 366 (citations omitted); *see also Devenpeck*, 543 U.S. at 150-53; *Jaegly*, 439 F.3d at 150-54.  In determining the point of arrest, the test is similar to that which applies to all restraints of liberty.  The question is whether a reasonable person would have thought he was free to leave, and, if not, whether his freedom was restrained to a degree associated with formal arrest.  *See United States v. Falso*, 293 Fed. Appx. 838, 839 (2d Cir. 2008) (citing *United States v.*

*Newton*, 369 F.3d 659, 671-72 (2d Cir. 2004)).  That determination

depends on objective circumstances, not the subjective beliefs of the police

or the citizen.  *See Falso*, 293 Fed. Appx. at 838-40 (citing *Stansbury v.*

*California*, 511 U.S. 318, 323 (1994)).

Once the point of arrest is established, the intrusion is justified under

the Fourth Amendment if probable cause exists.  While a complete

exposition of probable cause is not necessary here, several key principles

have a direct bearing on the court's conclusions.  "Probable cause is a fluid

concept—turning on the assessment of probabilities in particular factual

contexts—not readily, or even usefully, reduced to a neat set of legal

rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  In substance, all

probable cause definitions rely on reasonable grounds to believe that a

person is guilty of an offense.  *See Maryland v. Pringle*, 540 U.S. 366, 371

(2003).  The fact that a police officer identifies himself as such does not

necessarily turn a voluntary police-citizen public encounter into an

encounter that implicates the Fourth Amendment.  *See Royer*, 460 U.S. at

497.  Because probable cause is an objective inquiry, the officer's state of

mind or subjective intent is irrelevant.  *See Devenpeck*, 543 U.S. at 153

(citing *Whren v. United States* 517 U.S. 806, 812-13 (1996)); *see also*

25

*Miller*, 382 F. Supp.2d at 367 (collecting cases) ("If the seizure is ...

justified, it is irrelevant whether the police had some ulterior motive or

'pretext' for the stop ...."). Nonetheless, an officer's state of mind, if

objectively expressed, may have a bearing on whether an arrest has been

effectuated at all. In other words, a police declaration of arrest is the most

cogent objective fact even though that objective fact is a declaration of the

officer's subjective intent.

With these principles in mind, the court turns to the distinction

between the facts of this case and those present in *Devenpeck* and *Jaegly*.

Here, there was a break in the continuity between the underlying, non-

arrest events and the subsequent arrest which Smith caused by his own

conduct. *See, e.g.*, *United States v. Wickersham*, Nos. 08-3951, 08-3952,

2009 WL 2610816, *3 (6th Cir. Aug. 26, 2009) (citing *Goddard v. Kelly*, 629

F. Supp.2d 115, 127 (D. Mass. 2009) (Saylor, D.J.)).

In *Devenpeck*, Alford was detained during a roadside stop while the

police investigated whether he had criminally impersonated a police officer

by, among other things, using flashing headlights in violation of state traffic

law. During the roadside investigation, police discovered that Alford was

recording their conversation, which they believed constituted a violation of

the state Privacy Act.  *See Devenpeck*, 543 U.S. at 150.  They arrested

Alford, took him to the police station, and booked him on the Privacy Act

violation and the traffic infraction.  Both charges were subsequently

dismissed.  *See id.* at 150-51.  After Alford sued, a jury found that probable

cause supported his arrest, and returned a verdict for the police.  The Ninth

Circuit reversed because the Privacy Act violation was not a crime and,

although probable cause existed as to the uncharged crimes, those crimes

were not closely-related to the crime for which Alford was arrested.  *See id.*

at 152.  However, the Supreme Court held that the probable cause inquiry

is not limited to offenses that are closely-related to the offense charged at

arrest.  *See id.* at 152-53.

In *Jaegly*, Jaegly was arrested for both contempt of court for violating

an order of protection and harassment based on the same underlying

conduct.  *See Jaegly*, 439 F.3d at 150-51.  The Second Circuit observed

that while there may have been no basis to arrest for contempt, an

objective evaluation of the facts clearly supported the harassment charge.

*See id.* at 152.  Relying on *Devenpeck*, the Circuit thus concluded:

> [A] claim for false arrest turns only on whether probable cause
> existed to arrest a defendant, and ... it is not relevant whether
> probable cause existed with respect to each individual charge,

> or, indeed, any charge actually invoked by the arresting officer
> at the time of arrest.  Stated differently, when faced with a claim
> for false arrest, we focus on the validity of the *arrest* and not on
> the validity of each charge.

*Id.* at 154.  Both *Devenpeck* and *Jaegly* involved an unbroken chain of events leading to arrest, and both arrests were based on objective facts supporting a criminal offense.

In *Wickersham*, an Ohio trooper reasonably believed that Wickersham had cocaine in his vehicle, but was uncertain as to whether he had cause to stop the vehicle.  Trailing the vehicle, the trooper sped up, closed the gap between the two vehicles, and then watched as Wickersham responded by veering across lanes.  The trooper then used the unsafe lane change to stop Wickersham for a traffic violation, following which the vehicle was searched and cocaine was seized.  *See Wickersham*, 2009 WL 2610816, at *1-3.  Without discussing *Devenpeck*, and citing *Goddard*, the Sixth Circuit intimated that an officer-created violation might invalidate a Fourth Amendment intrusion.  *See id.* at *3.

In *Goddard*, Goddard, a Boston Red Sox fan, unhappy with an umpire's call favoring the Yankees during a game at Fenway Park, responded with verbal and non-verbal obscenities, all of which afforded a

28

reasonable basis to believe that he committed three separate offenses under Massachusetts law.  *See Goddard*, 629 F. Supp.2d at 120-21,125 & n. 12-14.[9]  At the behest of the umpiring crew, Goddard was approached by Boston's finest, told that he was ejected from the game, and that he would be arrested if he refused to leave.  *See id.* at 121.  Because Goddard agreed to go, the police elected not to arrest him, and instead escorted him to an outer door at Fenway where Goddard exited.[10]  *See id.* at 121-22.  Goddard was then approached by Red Sox security, and asked to step back into Fenway so that they could retrieve identification information and fill out an ejection report.  *See id.* at 122.  After re-entering the park, Goddard was accosted by the original officers orchestrating his ejection, and a fight ensued.  *See id.*  Goddard was arrested and charged with assaulting the police officers, trespass, and the original obscenity-related offenses.  *See id.* at 123.  Analyzing these events, Judge Saylor observed that the police made a conscious decision not to arrest Goddard

---

[9]While clearly not condoning Goddard's conduct, Judge Saylor seems to imply that the umpire's call was wrong, as might be expected from an obvious Red Sox fan.  This court recalls both the play and the many slow motion re-plays thereafter.  The umpire was right—at least from the perspective of a Yankee fan.

[10]While all of the ensuing circumstances are not unequivocally clear, Judge Saylor was considering a summary judgment motion and construed the facts in Goddard's favor.

after the initial conduct, and but for the subsequent intervention of the security officers causing Goddard's return to Fenway, there would have been no altercation giving rise to the trespass and assault charges. *See id.* at 126. Accordingly, Judge Saylor held that the validity of the arrest had to be judged on the basis of the new circumstances. *See id.* As Judge Saylor phrased it, "it is objectively unreasonable for a police officer to create the 'probable cause' for arrest by his own actions." *Id.* at 127. Distinguishing *Devenpeck*, Judge Saylor observed that at the time of arrest, the *Devenpeck* police were aware of the facts providing probable cause for some offense other than the offense of arrest. *See id.*

 *Gilles v. Repicky* also provides indirect support for the distinction the court observes in this case. 511 F.3d 239 (2d Cir. 2007). In *Gilles*, the Second Circuit reversed a grant of summary judgment because of a factual dispute regarding the reasonableness of a lengthy detention following a legitimate traffic stop. *See id.* at 241-243. Unquestionably, the police had cause to stop and cite Gilles for the traffic infraction of speeding, and they also had a reasonable suspicion that she was involved in terrorist activities. *See id.* Arguably, they detained her well beyond the point necessary to issue the traffic citation and beyond the point essential to dispel their

terrorist suspicions.  Thus, there was a question as to whether her

prolonged detention was tantamount to a de facto arrest.  Citing

*Devenpeck* but without further analysis, the Circuit remanded the case

noting that such circumstances could support a claim for false arrest.[11]

*See id.* at 246-47; *see also M.D. v. Smith*, 504 F. Supp.2d 1238 (M.D. Ala.

2007).

The initial encounter in this case occurred when Smith pulled his

vehicle alongside McClellan.  At that point, the encounter was in a public

place between Smith, a police officer, and McClellan, a citizen who had no

reason to believe that Smith was a police officer.  Smith testified that his

purpose was to warn McClellan to be careful, and he was not initiating a

traffic stop.  As Chief of Detectives, he did not even carry a ticket book.[12]

While he later testified that McClellan might have obstructed traffic in

violation of a section of the disorderly conduct statute different from the

section that supported the actual post-arrest disorderly conduct charge,

there was no arrest because the objective facts permit only one conclusion:

---

[11]The court cites *Gilles* as *indirect* support because it recognizes that, under ordinary circumstances, the issue of whether an authorized temporary detention has been converted into an unauthorized de facto arrest presents a jury question.

[12]The court is not suggesting that a ticket book is essential to a traffic stop.  Rather, this fact is further evidence corroborating Smith's stated purpose for the encounter.

Smith did not intend to arrest McClellan and McClellan had no reason to believe he was under arrest.  Accordingly, there was no Fourth Amendment intrusion since this was a police-citizen public encounter and since McClellan had no reasonable belief that he was being intruded upon. Even if there was a Fourth Amendment intrusion, its reasonableness would have been measured by the time necessary to issue a citation, following which both men would have gone about their business.  Even if measured by the potential pre-arrest, disorderly conduct charge that Smith had decided not to make, the reasonableness of the arrest would have been measured by transport to the station and release on desk bail or an appearance ticket.

Instead, the chain of events were broken when the police-citizen, non-arrest encounter spun out of control because of Smith's assaultive behavior.  McClellan's Fourth Amendment liberty interest to be free of arrest absent probable cause must be measured at the point that Smith exited the vehicle and told McClellan he was under arrest.  That is the point where McClellan understood that his liberty was restrained and Smith intended to restrain it, and it is at that point that the jury found there was no cause to support the restraint.  What Smith did thereafter was an attempt to

justify his unreasonable conduct by adding de minimis, non-criminal

charges which he had already abandoned.  Thus, Smith seeks to justify

unreasonable Fourth Amendment behavior on the basis of what he could

have done but did not actually do or intend to do.

The court does not believe the present facts support the *Devenpeck*

doctrine adhered to in *Jaegly*.  If the *Devenpeck* doctrine extends to these

facts, then Smith's analogy is apt and the Supreme Court and the Second

Circuit have indeed cast a wide net.  If so, a citizen who opens his car door

in traffic may be arrested for murder without any cause whatsoever, and

the arresting officer will not be liable on a resulting false imprisonment

claim.  (*See* Smith Mem. of Law at 11, Dkt. No. 118:3.)  The court does not

believe that either the Supreme Court or the Second Circuit intended their

holdings to sweep so broadly.

Furthermore, experience, practical considerations, and common

sense do not support extending the *Devenpeck* rationale to this case.

Before *Devenpeck*, this court recognized that probable cause is not limited

to charged or closely-related offenses.  *See, e.g.*, *Thompson v. Belardo*,

No. 1:03-cv-914 (N.D.N.Y. Aug. 19, 2005).  There are sound reasons for

that view.  New York prosecutors have always had to correct police

charging decisions because of misunderstood penal law definitions.

Accusatory instruments are commonly amended or dismissed because

they assert the wrong offense, not because they have no factual basis.

And police officers are frequently urged to avoid stacking similar or lesser

included offenses.  For all of these reasons, the reasonableness of a

restraint on liberty must be based on an objective assessment of the kind

of restraint at issue, and an objective assessment of the facts supporting

an officer's decision to initiate such a restraint.  Where, as here, an officer

is unhappy with a citizen's response to his authority, and manufactures a

basis to arrest him for more serious crimes than are supported by the facts,

he has exceeded his authority under the Fourth Amendment.  Thus, there

was no probable cause to arrest McClellan for assault.

      As for false imprisonment and qualified immunity, the right to be free

from false imprisonment without probable cause has long been

established.  *See Gilles*, 511 F.3d at 245.  An arresting officer is entitled to

qualified immunity if it was objectively reasonable for him to believe that

probable cause existed, or that officers of reasonable competence could

disagree on whether the probable cause existed.  *See Robinson v. Via*,

821 F.2d 913, 921 (2d Cir. 1987).  This standard is sometimes referred to

as "arguable probable cause."  *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  Since there was no probable cause supporting any post-stop arrest, and since no police officer would reasonably argue to the contrary, Smith's defense of qualified immunity is denied as are his alternative motions attacking the false imprisonment verdict.

Lastly, while the court recognizes that its *Devenpeck* distinction is a narrow one, any error that arose in charging the jury was harmless. Despite the court's best repeated efforts to get the parties to focus, they were non-cooperative before and during trial and of little help to the court in preparing jury instructions.  For example, Smith insisted that the court charge the jury that the *Devenpeck* probable cause principle was a complete defense to both the false imprisonment and malicious prosecution claims.  As the court has held, that view is plainly wrong. Neither party focused on the legal distinctions between the two claims, and neither party sought separate damage instructions.  Without objection, the jury was instructed to consider non-overlapping harm caused by any constitutional violation they found to have existed.  The evidence supporting their $150,000 award was almost entirely predicated on the malicious prosecution claim.  At most, damages associated with the false

imprisonment claim would have been limited to the less than twelve hours that McClellan spent in the police lock-up until his arraignment the following morning.  Therefore, based on all these factors, even if the substantive false imprisonment charge ran afoul of *Devenpeck*, any resulting error was harmless.

**B.**　**Propriety of Punitive Damages**

Smith argues that an award of punitive damages is inappropriate because McClellan did not offer any proof of conscious wrongdoing, nor was there any proof suggesting that Smith's conduct was reckless or involved callous indifference to McClellan's rights.  The court does not agree with Smith's interpretation of the trial evidence.  The evidence supported the jury's finding that Smith acted in bad faith and with a callous indifference to McClellan's rights.  Accordingly, the jury's award of punitive damages was permissible.

**C.**　**Failure to Disclose Key Evidence**

Lastly, Smith seeks a new trial because McClellan failed to disclose a key piece of evidence until the trial was already underway.  He argues that he was prejudiced by McClellan's failure to disclose a ten-page summary that McClellan provided to his psychologist relating to his history of stress,

anxiety, and combative behavior.  According to Smith, when this summary

report was disclosed at trial, his counsel had inadequate time to review it

and formulate a strategy for cross-examination.  Additionally, Smith

complains that the court indicated, in the presence of the jury, that it had no

doubt that Smith's counsel had received the summary report prior to trial.

The court discerns no prejudice from these events.  As Smith himself

acknowledges, his counsel was permitted a break of fifteen minutes to read

the report.  (*See* Trial Tr. at 542-43, Dkt. No. 125.)  Additionally, even

assuming that the court was wrong when it stated that the documents "may

well have and probably were provided" to Smith's counsel prior to trial, (*id.*

at 542), this statement was not prejudicial.  Indeed, the court's intent was to

convey to the jury that, in the court's view, neither side had acted in bad

faith and that an innocent misunderstanding had transpired.  There is no

reason to believe that this isolated and relatively innocuous comment had

any impact on the jury's verdict, especially since the jury was instructed to

disregard any comments the court may have made.[13]

---

[13]As to Smith's contention that the court should have admonished McClellan's counsel
for the tardy disclosure of the summary report, Smith did not then, and has not now, provided
the court with any reason to believe that admonishment would have been appropriate.  As the
court indicated at trial, the truth of what was and what was not disclosed was unclear, and,
more importantly, there was no evidence of bad faith.  (*See* Trial Tr. at 704-05, Dkt. No. 125.)
Simply put, someone made an unintended mistake having nothing to do with bad faith.  Smith

Moreover, this issue has no bearing on the court's assessment of the weight of the evidence. As stated, the Rule 59 standard is whether, "in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *DLC Mgmt. Corp.*, 163 F.3d at 133 (quotation marks and citation omitted). Here, the court finds that the jury was entitled to credit McClellan's testimony and discredit Smith's based on the evidence presented at trial and, in its view, the jury's factual findings were not against the weight of the evidence. Accordingly, to the extent Smith's Rule 59 motion relies on this argument, the motion is denied.

**D.** **Attorneys' Fees**

McClellan, as the prevailing party,[14] seeks attorneys' fees and costs in the amount of $104,614.49.[15] *See Buckhannon Bd. & Care Home, Inc.*

---

could also have misplaced or overlooked the document which was actually provided. The court does not question the attorney's assertion that he had not seen the document. That does not mean, however, that opposing counsel failed to provide it. Regardless, the entire issue is of no moment because the court provided defense counsel with an opportunity to review the document.

[14]Section 1988 permits the court, in its discretion, to award reasonable attorneys' fees to a "prevailing party" in any action or proceeding brought to enforce the provisions of 42 U.S.C. § 1983. *See* 42 U.S.C. § 1988(b); *see also Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 102 (2d Cir. 2009). A "prevailing party" is one "who has established his entitlement to some relief on the merits of his claims ...." *Hanrahan v. Hampton*, 446 U.S. 754, 757 (1980).

[15]This figure represents 463.3 attorney hours worked at a rate of $210 per hour, and $7,321.49 in costs.

38

*v. W. Va. Dep't of Health &Human Res.*, 532 U.S. 598, 603 (2001).  Smith

claims that this amount is grossly excessive.

As to the amount of attorney's fees to award, courts within the

Second Circuit apply a "presumptively reasonable fee analysis."  *Porzig v.*

*Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 141 (2d Cir.

2007).  This analysis "involves determining the reasonable hourly rate for

each attorney and the reasonable number of hours expended, and

multiplying the two figures together to obtain the presumptively reasonable

fee award."  *Id.* (citations omitted).  In determining what is reasonable the

following factors are useful:

> (1) the time and labor required; (2) the novelty and difficulty of
> the questions; (3) the level of skill required to perform the legal
> service properly; (4) the preclusion of employment by the
> attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or
> contingent; (7) the time limitations imposed by the client or the
> circumstances; (8) the amount involved in the case and the
> results obtained; (9) the experience, reputation, and ability of
> the attorneys; (10) the "undesirability" of the case; (11) the
> nature and length of the professional relationship with the
> client; and (12) awards in similar cases.

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and*

*Albany County Bd. of Elections*, 522 F.3d 182, 186 n.3 (2d Cir. 2008)

(citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th

Cir. 1974)).

Here, all of the factors weigh in favor of granting the motion for attorneys' fees. First, Mr. Greenstein argues that the lawsuit involved highly novel and difficult questions of law which precluded him from retaining as many clients as he would have had he not represented McClellan. In addition, he notes that time spent on this case was carefully allocated because doing so not only prevented services on other, fee-generating cases, it also limited the income potential of the firm in the event of a loss. As far as the time, labor, and time limitations are concerned, numerous witnesses were examined prior to trial and fifteen witnesses were called by McClellan on direct. Through numerous motions and interlocutory appeals, both pre-trial and post-trial, counsel expended a significant amount of time. On the issue of "undesirability" of the case, counsel took financial and professional risks by taking the case. About half of his practice is committed to criminal defense, requiring significant interaction with the Rensselaer District Attorney's Office, the Rensselaer City Police Department, Rensselaer City court personnel, and various Rensselaer County law enforcement officials. And finally, the fee request comports with other similar awards. *See DiSorbo v. City of Schenectady,*

No. 99-cv-1131, 2004 WL 115009, at *2-5 (N.D.N.Y. Jan. 9, 2004).  Thus, given these considerations and given the success of counsel in this case, the time expended was reasonable and the court grants the fees and costs in their entirety.

### V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Smith is not entitled to qualified immunity on the false imprisonment and malicious prosecution claims; and it is further

**ORDERED** that Smith's alternative motions for judgment notwithstanding the verdict or for a new trial are **DENIED**; and it is further

**ORDERED** that McClellan's motion for attorney's fees and costs is **GRANTED** in the amount of $104,614.49; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties.

**IT IS SO ORDERED.**

October 26, 2009
Albany, New York

United States District Court Judge